UNITED STATES of America, Plaintiff,

v.

SIEMENS CORPORATION and G. D. Searle & Co., Defendants.

No. 80 Civ. 1435 (VLB).

United States District Court, S. D. New York.

March 20, 1980.

U. S. Dept. of Justice, Antitrust Div., by Kenneth M. Frankel, Washington, D. C., for plaintiff.

Sidley & Austin, Chicago, Ill., Davis, Polk & Wardwell, New York City, for defendant G. D. Searle & Co.

Shearman & Sterling, New York City, for defendant Siemens Corp.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

Plaintiff United States of America has applied for a preliminary injunction pursuant to 15 U.S.C. § 25 and Rule 65(a) of the Federal Rules of Civil Procedure, pending a determination of the merits of this action. Plaintiff seeks to enjoin the implementation of an asset purchase agreement between defendants Siemens Corporation and G.D. Searle & Co., by the terms of which Siemens would, *inter alia*, purchase the assets of Searle Diagnostics Inc. ("SDI"), a Delaware corporation owned by Searle. Searle is a Delaware corporation with principal offices in Skokie, Illinois. Siemens is a Delaware corporation with offices in New York which is wholly owned by Siemens A.G., a West German corporation.

Plaintiff claims that the acquisition which it seeks to enjoin would violate Section 7 of the Clayton Act (15 U.S.C. § 18) because it may tend substantially to lessen competition in the sale of nuclear medical imaging equipment in the United States.

The hearing on the application for a preliminary injunction was held on March 13 and 14, 1980. On the bases set forth in this memorandum, the application is denied.

It seems to be conceded, at least for purposes of the hearing on the preliminary

injunction, that the relevant line of commerce is the sale and servicing of nuclear medical imaging equipment, and that the relevant market is the entire United States. Nuclear medical imaging equipment is equipment used by doctors, generally in hospitals but occasionally in clinics or in private offices, to receive and interpret radiation emissions from medical patients, and form images of the patient's internal organs. Its principal component is a so-called gamma camera. It is one of four major categories of medical diagnostic imaging equipment. The other categories are X-ray, X-ray computer tomography, and ultrasound. Each type of equipment provides images of internal body organs, tissue, or structures that are generally useful in medical diagnosis. Nuclear medical imaging equipment is highly sophisticated and quite expensive—in the neighborhood of $100,000 per unit when sold with a computer.[1] Because of the sophistication of the equipment and because it is employed on a fairly constant basis in life-and-death diagnostic medical situations, it is essential that there be available with respect to it a quickly responding service resource, and this service resource is apparently a part of the total package that is marketed.

Searle (through SDI) was one of the pioneers in the nuclear medical imaging field and it is the largest marketer of nuclear medical imaging equipment in the United States. It manufactures and distributes this equipment. Its market share has been falling steadily in recent years, however, and it has sustained operating losses in the nuclear medical imaging field. Two or three years ago it discontinued activities in fields related to that of nuclear medical imaging, and it substantially reduced its staff. Although at that time it decided to continue in the nuclear medical imaging field, a decision was apparently made by management in the early part of 1979 to dispose of the business of its diagnostic division (which included the nuclear medical imaging business).

Siemens is preeminent in the distribution of sophisticated X-ray equipment, in this country and throughout the world. It manufactures the X-ray equipment it distributes. It also presently distributes nuclear medical imaging equipment in various parts of the world outside of the United States, and has until recently obtained that equipment from an American manufacturer, Ohio Nuclear. Because of its X-ray equipment, which is of superior quality, Siemens has an established reputation among medical consumers in the United States and among its competitors who distribute X-ray equipment.

Plaintiff premises its claim that the proposed acquisition is in violation of law upon two antitrust doctrines—the actual potential entrant doctrine and the perceived potential entrant doctrine.

Under the actual potential entrant doctrine as urged by plaintiff, a company outside of a relevant geographic market in a relevant line of commerce would be prohibited from entering that market through acquisition of a large competitor (or through acquisition of the assets of a large competitor) in that market if the acquiring company is expected, at some future date, to enter that market with its own resources, or through the acquisition of a firm which does not have a significant market share (a so-called "toe-hold" acquisition).

Under the perceived potential entrant doctrine, a substantial company outside of a relevant geographic market in a relevant line of commerce would be prohibited from entering that market if, whatever its own intentions, it is perceived by participants in the market as a likely entrant into that market. The theory underlying this doctrine is that while this "perceived potential entrant" is still "in the wings," it has a beneficial effect upon prices and upon competition. With such an outsider "in the wings," the insiders "keep prices and profit margins lower than they would if there

---

1. A unit consists of a colimator; a detector assembly consisting of a scintillation crystal and an array of photomultiplier tubes; an electronic processing assembly to reproduce the image from the photomultiplier tubes; and a mechanical stand.

were no threat of the outsider entering the market either de novo or via a toehold acquisition of a small firm, a threat that might be realized if prices and profits were higher." *Boc Intern. LTD. v. F. T. C.*, 557 F.2d 24, 26 (2d Cir. 1977). This impact would be lost once the outsider enters the market by acquisition of a large participant in the market (or by acquisition of the assets of such a participant).

■ I am unable, even tentatively, to determine, on the predicate of the evidence submitted at the preliminary injunction hearing, whether the effect of implementation of the challenged asset purchase agreement "may be substantially to lessen competition," on application of either the actual potential entrant doctrine or the perceived potential entrant doctrine. There are too many questions left unanswered on the record before me—such as questions with respect to the nature of the market, the parameters of the market, the nature, scope and mechanics of competition in that market, the scope and significance of previous activities of the defendants in the market (Searle) or on the periphery of the market (Siemens), and the effect on the market of government regulation addressed to the consumer.

What is the nature of the market? The commodity being distributed and serviced has certain very unique features which must be explored before answers can be had to the questions raised by the complaint in this action. The gamma camera and its components, with computer, cost in the neighborhood of $100,000. That is a major expenditure. Has the possible market already been fully sold, or will reductions in price have an impact upon demand? There is a finite number of hospitals in this country, and a finite number of clinics and individual doctors who will require, or can sustain the cost of, medical equipment. Certainly these matters would have some impact in determining whether Siemens was a perceived or actual potential entrant into the market.

Would the acquisition by Siemens be pro rather than anti competitive? Certainly inferences to this effect might be drawn on the evidence before me. Whether or not Searle had actually decided to discontinue activity in the nuclear medical imaging market prior to the inception of negotiations with Siemens, it had certainly, as noted, lost market share, and it had certainly, as noted, reduced its financial and personnel commitment to this market. In the hands of a new management, installed by a company willing to make a substantial financial commitment, the transferred assets might be more competitive with others in the market than heretofore. Here, again, the evidence before me is too sparse to make definitive findings.

Is the relevant market that in which sale is made by manufacturers to distributors; that in which distribution is made to ultimate consumers; or is it one market which encompasses both? The answer to these questions, again, may have significance with respect to the perception of Siemens as a potential entrant, or to its status as an actual potential entrant.

Who makes the consumer decisions? Obviously both X-ray equipment and nuclear medical imaging equipment are sold to hospitals. Who within the hospital makes the decision to purchase, and chooses among competitors? There is conflicting evidence on this subject before me, without sufficient delineation for me to make a determination. Related to this question is the question of whether the same sales force can sell X-ray equipment and nuclear medical imaging equipment. Here again there is conflicting, but scanty, evidence. These are, in my judgment, significant questions, because the perception of Siemens as a potential entrant into the market, and Siemens' status as an actual potential entrant, would certainly seem to be influenced by how those questions are answered.

Siemens once manufactured gamma cameras and apparently distributed them in various parts of the world outside the United States. It discontinued manufacture within a couple of years, and apparently its venture into this particular manufacturing field was unsuccessful. More recently it

has distributed gamma cameras outside of the United States, purchasing these cameras from an American manufacturer, Ohio Nuclear. The only evidence before me with respect to the reason for its lack of success in manufacturing gamma cameras is to the effect that ·it came into the field too late and was never able to catch up with developments—it missed the market. What effect did this past history have upon perceptions of Siemens as a potential entrant into the market?

While Searle· is presently the dominant company in the nuclear medical imaging field, it has had operational losses in recent years, and it has also, in recent years, lost substantial percentages of market share. In very recent years it has severely reduced its staff in the nuclear medical imaging field. There is some evidence that Searle's loss in market share is attributable to its failure to stay up with technical developments. Sufficient facts have not been presented for me to determine what, if any, cause-and-effect relationship there is between the reduction in staff and the loss in market share.

What impact does state and federal regulation have upon the market? No evidence has been offered with respect to this, save a suggestion in one of the exhibits that state control of the flow of funds to hospitals may have an impact. State and, to a lesser extent, federal regulation certainly does have impact upon the nature, quality, and extent of medical services offered to the public, and certainly plays an important part in shaping the market with which this action is concerned.

Some evidence was offered by plaintiff to the effect that Siemens was perceived as a potential entrant in the nuclear medical imaging market in the United States. To the extent that there was any evidence offered at the preliminary injunction hearing on the impact of this perception on the marketing or pricing policies of companies whose employees so perceived Siemens, it indicated that there was no such impact.

■ The perceived potential entrant doctrine is not a talismanic absolute. If the evidence indicates that a company "in the wings" is perceived as a potential entrant into the market and the evidence further indicates that the perception has had no impact of any nature, any inference that pro competitive influences would be eliminated by actual entrance would be negated. The only evidence before me on this subject tends in that direction.

■ A preliminary injunction can be granted, and very often is, in antitrust contexts, without having in hand all the evidence necessary for definitive resolution of the issues raised in the complaint. There must be, in such a case, sufficient evidence before the judge to persuade him that the issuance of the preliminary injunction is "just in the premises." 15 U.S.C. § 25. I am not so persuaded—I require much more information than has been made available to me.

Conversely, my decision not to grant a preliminary injunction is certainly in no way a decision that the challenged transaction will not violate the antitrust laws, and it should not be so construed.

SO ORDERED.